Judgment rendered October 22, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,446-CW

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

CAROLYN SLACK                                    Respondent

versus

BROOKSHIRE GROCERY                               Applicant
COMPANY D/B/A SUPER ONE
FOODS

* * * * *

On Application for Writs from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 20220953

Honorable Frederick Douglass Jones, Judge

* * * * *

HUDSON, POTTS & BERNSTEIN, LLP          Counsel for Applicant
By:  Donald H. Zeigler, III

OFFICE OF ANTHONY J. BRUSCATO          Counsel for Respondent
By:  Anthony J. Bruscato

CATHERINE LEARY

* * * * *

Before PITMAN, COX, and ROBINSON, JJ.

**ROBINSON, J.**

In this slip-and-fall case, Brookshire Grocery Company d/b/a Super One Foods ("Brookshire") applied for a supervisory writ with this court after the trial court denied its motion for summary judgment. The writ was granted to docket. Concluding that a genuine issue of material fact exists concerning whether Brookshire created the hazardous condition, we recall the writ as improvidently granted and deny it. The judgment denying the motion for summary judgment is affirmed.

### FACTS

On the morning of November 10, 2021, an unidentified customer ("customer") picked up an order of 200 baked chicken pieces at the deli counter at the Super One Foods grocery store in Monroe, Louisiana. The chicken had been placed into four trays with chicken grease added to keep the pieces moist. The trays, which were each covered by aluminum foil tucked along the edges, were placed in the customer's shopping cart. Three trays were stacked in the upper compartment, and one tray was placed in the undercarriage compartment.

While the customer was waiting for her turn at a store checkout counter, chicken grease leaked from at least one tray and deposited on the floor. Several minutes later, Carolyn Slack slipped and fell in the grease when she approached the checkout counter.

On December 9, 2021, Slack filed suit in Monroe City Court against Brookshire. She alleged that the hazardous floor condition was created in whole or in part by the failure of the store employees to properly secure the pan of chicken.

Brookshire filed a motion to transfer the case to the Fourth Judicial District in Ouachita Parish. The motion to transfer was granted.

Slack propounded a discovery request for Brookshire to produce "all video that captured the incident in question." On November 21, 2022, Brookshire objected to production of the video on the grounds that the video constituted sensitive trade secrets and disclosure would jeopardize the store's anti-fraud and anti-theft measures. Brookshire agreed to turn over the video upon the entry of a protective order. Slack filed a motion to compel.

While the discovery issue concerning the video was still pending, Brookshire filed a motion for summary judgment on March 10, 2023. Brookshire argued that Slack could not meet her burden of proving the notice element of her claim because there was no proof that it had actual or constructive notice that the chicken grease was on the floor or that it had created the condition by placing or allowing the grease to leak onto the floor. In support of its motion, Brookshire submitted an affidavit from the store's assistant manager, an affidavit from the store's deli manager, and Slack's petition.

Darwin Spears, the store's assistant manager who was on duty at the time of the incident, stated in his affidavit that Slack had slipped on chicken grease which had leaked from a customer's shopping cart. He determined that the customer was at the incident location at approximately 11:18 a.m., and that Slack fell at approximately 11:21 a.m. He determined that no store employee passed through the area after the customer was at the incident location and before Slack fell. Spears asserted that he did not place the grease on the floor or allow it to be placed on the floor, and that he had no

2

knowledge that the grease was on the floor before Slack fell. Spears stated that neither he nor any other store employee had possession or control of the chicken pan when it leaked while in the customer's possession. To his knowledge, no store employee knew of the grease being on the floor before Slack fell, no store employee knew how long the grease was on the floor before Slack fell, and no store employee placed or allowed the grease to be on the floor before Slack fell.

Nancy Conway, the store's deli manager, stated in her affidavit that she had prepared and packaged the pan of chicken in a safe manner, and that the pan was not leaking any substance, including chicken grease, while it was in her possession and under her control. Conway asserted that the pan was not leaking or showing any indication that it might leak when she transferred the pan to the customer, and that the pan was in a good and safe condition when it left her possession and control. Conway stated that neither she nor any other store employee had possession or control of the chicken pan when it leaked while in the customer's possession, and she did not place the grease on the floor or allow it to be placed on the floor before Slack fell. Conway also stated that she had no knowledge that the grease had been on the floor before Slack fell. To Conway's knowledge, no store employee knew of the grease being on the floor before Slack fell, no store employee knew how long the grease was on the floor before Slack fell, and no store employee placed or allowed the grease to be on the floor before Slack fell.

On June 22, 2023, the trial court granted Slack's motion to compel production of the video subject to a protective order.

On January 2, 2025, Brookshire filed a supplemental memorandum in support of its motion for summary judgment. Excerpts from Slack's

3

December 16, 2024, deposition were attached to the supplemental memorandum. Slack testified that she did not know if store employees knew the grease was on the floor before she fell, and she did not know how long the substance was on the floor.

On January 21, 2025, Slack filed her opposition to the motion for summary judgment. She argued that the store created the puddle when Conway failed to exercise reasonable care in packaging and stacking the chicken pans. She also argued that the video showed Spears looking at the puddle of grease on the floor and not taking precautionary measures before Slack fell. Slack attached Conway's deposition, Spears's deposition, the store's accident report, photos taken by Spears at the scene, the store's video of the incident, still frames taken from the store's video, and a chronology prepared by her attorney.

Nancy Conway testified at her March 30, 2023, deposition that she had worked in the deli for 19 years. The deli is located in the rear of the store. She recalled that the order prepared for the customer was for a church which frequently ordered chicken. The order was for 200 mixed pieces of baked chicken. The round pans used to hold the chicken pieces were the largest in the store. She likened them to jumbo roasting pans. Each pan held 50 pieces of chicken.

Conway explained that the grease came from smoking the chicken. She poured the grease into the bottom of the pans to keep the chicken moist. When asked how deep the grease was in each pan, she used a finger and a thumb to indicate the depth. The pans did not have lids, so she used heavy-duty aluminum foil to cover the pans and tucked it in along the edges. The foil was along the top and sides of each pan, but not the bottom.

4

Conway testified that she loaded the pans in the customer's empty shopping cart, stacking three of the pans in the top compartment and placing one pan in the bottom compartment. She did not place more than three pans in the top compartment because she did not want to stack them too high and because the customer said she had more shopping to do. When asked if that was how she normally placed the pans in the cart, she answered: "No. Because usually, they – some only get two. Some get fried chicken and baked chicken." The customer was given a tag to give to the cashier.

Conway testified that she first learned someone had fallen when she was called over the intercom to go to the front of the store. She saw a pan of chicken on the counter, and an employee wiping up grease from the counter with paper towels. On her own initiative, she walked the same path that the customer had walked and did not see any grease on the ground. She also checked the path toward the meat market because someone said the customer had been over there. Spears spoke with Conway later that day about the incident.

Spears did not ask her any questions, including about how she had packaged the chicken, but just told her that someone had slipped and fallen at the register near where the customer had been standing.

Conway did not know if there was a hole in the bottom of the pan or how the grease came out of the pan. She has never had a pan leak or one where the foil covering the top and sides got loose during her 19 years in the deli.

Darwin Spears's deposition was taken on March 30, 2023, which was before Slack's motion to compel production of the video was granted. Spears did not bring the video of the incident with him even though he

acknowledged that he had been served with a subpoena to produce the video that captured the incident. He explained that the video was Brookshire's property, and he did not ask them for it even though he had viewed the video with Brookshire's counsel the day before his deposition. He never told Brookshire's attorney that he needed to bring the video to the deposition.

Spears explained that he wrote down the incident information, then typed it into a computer program which generated a report. He sent the report along with a drive containing the video footage to Brookshire's office.

Several photographs of the incident site were taken by Spears. He estimated that the trail of grease was 8-9 feet in length.

Spears did not get the name of the customer who purchased the baked chicken even though he believed that she was still in the store when he reached the accident location. He did not get the checkout cashier's name and did not recognize her from the video. He did not recall if he looked at the pans holding the chicken. He thought the pans were still covered when he looked at them on the video. He did not know if the pan had a hole in the side or bottom before it was given to the customer.

Spears did not know how the grease dripped from the pan. However, he thought the customer who purchased the chicken was at fault. He guessed the customer put something in her buggy that tipped over the pan or jarred the cover loose. He thought the video showed the customer having additional items in her shopping cart. He also considered that the customer may have moved the pan out of her buggy or set it in her buggy improperly. He was unsure if he asked Conway about the pan. Spears did not know if the store had a deli policy and procedure to ensure that the packaging of deli

6

products was done securely to prevent the contents from coming out and causing a customer to fall.

Brookshire filed a reply memorandum in support of its motion. It objected to the video, still images from the video, and the chronology on the grounds that they were inadmissible under La. C.C.P. art. 966(A)(4)(a). It argued that even if the video was admissible, there is no evidence that the person in the video was Spears.

At the hearing on the motion for summary judgment, the trial court ruled that the video and photographs were not admissible.

On February 20, 2025, the trial court rendered judgment denying the motion. The court found there were genuine issues of material fact still outstanding in this matter surrounding negligence and actual and constructive knowledge.

Brookshire applied for a supervisory writ with this court. On April 15, 2025, this court granted the writ to docket.

## DISCUSSION

### *Summary judgment*

The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by La. C.C.P. art. 969; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

7

Regarding the burden of proof on the motion, La. C.C.P. art. 966(D)(1) states:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

The district court cannot make credibility calls on a motion for summary judgment, but must draw those inferences from the undisputed facts which are most favorable to the party opposing the motion. *Independent Fire Ins. Co. v. Sunbeam Corp.*, 99-2181 (La. 2/29/00), 755 So. 2d 226; *Nelson v. Shelat*, 55,434 (La. App. 2 Cir. 2/28/24), 381 So. 3d 248.

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880.

As noted earlier, Brookshire objected to the admissibility of the video and still photos from the video filed in opposition to its motion for summary judgment. La. C.C.P. art. 966(D)(2) states that "[t]he court shall consider only those documents filed or referenced in support of or in opposition to the motion for summary judgment but shall not consider any document that is excluded pursuant to a timely filed objection."

8

La. C.C.P. art. 966(A)(4)(a) governs what can be filed or referenced in support of or in opposition to a motion for summary judgment. It states: "The only documents that may be filed or referenced in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, certified copies of public documents or public records, certified copies of insurance policies, authentic acts, private acts duly acknowledged, promissory notes and assignments thereof, written stipulations, and admissions." Notably, videos and photographs are not mentioned. However, the 2015 comment to Article 966 states, with emphasis added:

> (c) Subparagraph (A)(4), which is new, contains the exclusive list of documents that may be filed in support of or in opposition to a motion for summary judgment. This Subparagraph intentionally does not allow the filing of documents that are not included in the exclusive list, such as photographs, *pictures*, *video images*, or contracts, *unless they are properly authenticated by an affidavit or deposition to which they are attached*.

The introduction of documents which are not included in this exclusive list, such as pictures or video images, is not permitted unless they are properly authenticated by an affidavit or the deposition to which they are attached. *Rives Plantation, L.L.C. v. BPX Properties (N.A.) LP*, 55,301 (La. App. 2 Cir. 12/20/23), 376 So. 3d 328, *writ denied*, 24-00109 (La. 3/12/24), 381 So. 3d 50.

Authentication is a process whereby something is shown to be what it purports to be. *Schexnayder v. Gish*, 41,819 (La. App. 2 Cir. 2/7/07), 948 So. 2d 1259. Evidence must either be authenticated as provided in La. C.E. art. 901, or it must be self-authenticating. *Id*. The aforementioned comment to Article 966 sets out the relevant manner of authentication.

9

Brookshire argues that there is no evidence that Spears is the individual shown in the video looking toward the grease on the ground shortly before Slack fell. However, Spears testified that the video captured him wiping up the spill, so it is not difficult for a reasonable viewer to identify him when shown on the video. Moreover, despite protests from Brookshire's counsel about the video being used to oppose the motion for summary judgment without being properly authenticated, it is the video submitted in response to Slack's discovery request for the video which captured the incident. We also note that in his affidavit, Spears referred to the approximate times when the customer was at the location of the fall and when Slack fell, which leaves this court to wonder if Spears acquired those times from the video.

We are also mindful that Spears appeared at his deposition without the video, despite having viewed it with Brookshire's counsel the day before the deposition. Production of the video was ordered by the trial court three months after the deposition. Slack's counsel did not retake Spears's deposition after obtaining the video.

The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of discretion. *Taylor v. Nexion Health at Pierremont, Inc.*, 54,802 (La. App. 2 Cir. 12/14/22), 353 So. 3d 403, footnote 2, *writs denied*, 23-00057 (La. 3/14/23), 357 So. 3d 823, 23-00056 (La. 3/14/23), 357 So. 3d 830.

While we understand Slack's plight concerning the video, it is clear that the video and still images taken from it would need to be authenticated by an attached affidavit or deposition, which did not happen. Accordingly, we are constrained to conclude that the trial court did not abuse its broad

10

discretion in excluding the video and the still images obtained from the video. We also find Slack's argument that the video was admissible as an admission to be without merit.

*Merchants' liability*

La. R.S. 9:2800.6(B) sets forth the burden of proof in lawsuits against merchants in slip-and-fall cases:

> B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
>
> (1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
> (2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
> (3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

La. R.S. 9:2800.6(C)(1) defines constructive notice in (B)(2) as meaning:

> [T]he claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

*Actual and constructive notice*:

There is no summary judgment evidence in the record that any Brookshire employee had actual notice that chicken grease had dripped on the floor in the location where Slack fell.

11

Regarding the constructive notice element, our supreme court has stated:

> [B]ecause constructive notice is plainly defined to include a mandatory temporal element, we find that where a claimant is relying upon constructive notice under La. R.S. 9:2800.6(B)(2) (1991), the claimant must come forward with positive evidence showing that the damage-causing condition existed for some period of time, and that such time was sufficient to place the merchant defendant on notice of its existence.

*White v. Wal-Mart Stores, Inc.*, 97-0393, p. 1 (La. 9/9/97), 699 So. 2d 1081, 1082.

In *Bourn v. Federated Mutual Insurance Company*, 54,977 (La. App. 2 Cir. 4/5/23), 361 So. 3d 538, the plaintiff slipped in a puddle of gasoline at a gas station. The gas was on the ground for 4 minutes and 44 seconds. This court concluded that was not a period of time sufficient to place the station on notice of its existence, or that the station's failure to detect and remedy the gas on the ground within that short timeframe was a lack of reasonable care.

In this matter, three minutes was simply not enough time for a Brookshire employee to have constructive notice that the chicken grease had dripped to the floor where the customer had been standing while waiting for her turn at the checkout counter.

### *Creation of the condition*

Brookshire argues there is no evidence that it created the hazardous condition by placing chicken grease on the floor. Brookshire further argues that there is no evidence that Conway negligently packaged the chicken.

In support of its argument, Brookshire relies on *Matlock v. Brookshire Grocery Company*, 53,069 (La. App. 2 Cir. 11/20/19), 285 So. 3d 76, *writ denied*, 20-00259 (La. 4/27/20), 295 So. 3d 389. Brookshire maintains that

12

this court in *Matlock* rejected the argument that the failure to exercise reasonable care in packaging the chicken was equivalent to creating a dangerous condition. Brookshire also maintains that unlike in *Matlock*, the grease leaked from a chicken pan while it was in the possession and control of a third-party customer.

Matlock slipped and fell after stepping into a puddle of watermelon juice near a bin of watermelons. Two "wet floor" signs had been placed in the area. The store's assistant manager testified in his deposition that watermelons leaked on occasion and there was no way to determine if a leaky watermelon was located in the bin other than from the appearance of liquid on the floor or from the presence of gnats. He added that warning cones were always present in the produce section even when the floor was not wet in order to remind customers to be careful, and that employees monitored the floor in the produce section all day long. The trial court in *Matlock* granted the store's motion for summary judgment.

Matlock argued on appeal that Brookshire's procedures for purchasing, storing, inspecting, and displaying watermelons resulted in the potential for watermelon juice to leak onto the floor and create a hazardous condition for customers. He added that the evidence showed that despite Brookshire having knowledge that leaking watermelon juice was a recurrent and chronic problem, Brookshire failed to inspect the watermelons prior to displaying them and periodically thereafter, and it also failed to place an absorbent material beneath the watermelon bin. Thus, he contended that a reasonable fact finder could conclude the store created the hazardous condition by failing to eliminate or reduce the risk of watermelon juice leaking into the aisle. This court rejected that argument:

13

This argument blurs the lines of the elements of proof required by La. R.S. 9:2800.6. Matlock's assertions regarding Brookshire's creation of the puddle actually address the reasonable care element of subsection B(3). Matlock's argument suggests a merchant's failure to exercise reasonable care is the equivalent of a merchant creating a dangerous condition. However, such an interpretation would nullify subsection B(3) of the statute.

A similar argument was rejected by the court in *Ross v. Schwegmann Giant Super Markets, Inc.*, 1998-1036 (La. App. 1 Cir. 5/14/99), 734 So. 2d 910, *writ denied*, 1999-1741 (La. 10/1/99), 748 So. 2d 444. There, the plaintiff slipped and fell after stepping on a small amount of crab salad on the floor from a nearby self-serving sampling station and argued the store failed to exercise reasonable care in creating the hazardous condition where it was known that customers who sampled the salad would spill or drop it on the floor. The evidence did not show how the salad came to be on the floor or how long it had been there. In affirming summary judgment in favor of the store, the court noted there was no evidence the crab salad was on the floor due to an act by a store employee and there was nothing in the record that could establish the store had any notice of the salad on the floor; thus there was no issue of fact that the store had either created or had actual or constructive notice of the salad on the floor.

Here, like the plaintiff in *Ross v. Schwegmann*, *supra*, Matlock has simply failed to present any factual support for his speculation that Brookshire's employees or methods were responsible for creating the puddle of watermelon juice Matlock slipped in. Matlock offers no evidence remotely supporting the notion that but for Brookshire's procedure for purchasing, storing, inspecting, and displaying the watermelons, the puddle of watermelon juice on which he slipped would not have been created.

*Id*. at pp. 9-10, 285 So. 3d at 82.

In *Ross*, the plaintiff slipped in a small amount of crab salad on the grocery's floor located 10-12 feet from a seafood counter where the grocery had placed a self-service sampling station of crab salad. Ross did not know why the crab salad was on the floor or for how long it had been on the floor. According to an affidavit from a safety consultant hired by Ross, spillage or droppage by customers participating in unsupervised sampling was

14

foreseeable and highly likely to occur. He concluded that the grocery failed to exercise reasonable care in creating the crab salad floor hazard where it was known that customers who sampled the crab salad would spill or drop it on the floor.

The *Ross* court concluded that the safety consultant's assertions addressed the element of proof to establish the lack of reasonable care, not whether the grocery was responsible for the actual spill or drop of the crab salad. The court stated:

> [W]e find that the wording of LSA–R.S. 9:2800.6 B(2) which requires plaintiff prove that "the merchant ... created ... the condition which caused the damage" means there must be proof that the merchant is directly responsible for the spill or other hazardous condition. In this case, there is no evidence that would establish that the crab salad found its way onto the floor because of an act by a Schwegmann employee. Rather, the overwhelming implication is the crab salad was dropped by a customer.

*Id*. at p. 5, 734 So. 2d at 913.

The fifth circuit approached the creation issue differently in *Salzman v. Matherne's Supermarket at Riverlands, L.L.C.*, 22-404 (La. App. 5 Cir. 6/22/23), 367 So. 3d 897, *writ denied*, 23-01116 (La. 11/15/23), 373 So. 3d 73. Salzman slipped on chicken juice drippings on the store floor. The assistant store manager testified in her deposition that it was not unusual to see juice drippings on the store's floor. The store provided plastic bags near the meat case for the customers to wrap the packages in order to prevent leaking. The store manager testified that leaking from meat containers was not rare. Store employees were trained to walk the display case to check for leaking packages and to walk the aisles looking for puddles from leaking packages.

15

Salzman argued in opposition to summary judgment that the store created the hazardous condition which caused her fall by negligently addressing the frequent and repeated leaking of liquid meat byproducts throughout the store. The fifth circuit considered the question of whether a store's failure to correct a known problem with its packaged meat products and repackaging methods could qualify as the creation of a hazardous condition under La. R.S. 9:2800.6(B)(2). The court concluded that the creation of a hazardous condition includes both direct action and the failure to act. In that matter, it was uncorrected, continuous, and recurrent leaking; the store knew of the risk of leaking and failed to prevent it.

In *Wallace v. Brookshire Grocery Company*, 55,877 (La. App. 2 Cir. 10/2/24), 400 So. 3d 1057, this court stated that a plaintiff arguing that a merchant created a slipping hazard must show the source of the substance constituting the hazard, and ordinarily a plaintiff must further prove that affirmative conduct by the defendant directly and immediately created the hazard. Wallace slipped and fell in a puddle of water in the store's produce section that she believed leaked from a cooler. In opposition to the store's motion for summary judgment, Wallace asserted that she overheard an employee say that a cooler was out, there was no "wet floor" sign near the puddle, and that the assistant store manager admitted that there was no protocol for inspecting the produce section. This court concluded this was insufficient to prove that a cooler was the source of the puddle or that a store employee affirmatively caused the cooler to leak. This court stated that the mere failure to respond appropriately to a known leak was insufficient to constitute creation of the hazard, and that Wallace erroneously conflated

16

creation of a hazard with the failure to exercise reasonable care in responding to the hazard.

Juice leaking from watermelons, such as what happened in *Matlock*, is apparently a natural occurrence. Grease leaking from pans holding baked chicken is not. Moreover, the display holding the watermelons was a static display. Here, the customer moved through the store as at least one pan began leaking chicken grease. Conway made the conclusory assertion in her affidavit that she packaged the chicken in a safe manner. Nevertheless, a pan began dripping chicken grease. Conway obviously had some concerns about the arrangement and utility of the pans as she stated that she did not want to stack the pans too high. We agree with Slack's counsel that expert testimony is not needed to assess whether covering a pan with foil, tucking the foil along the sides, and then stacking three pans atop one another may or may not have led to overflowing of the liquid contents of the pans. Spears attempted to place blame for the leakage on the customer. However, Spears did not obtain the customer's name and there is no indication in the record whether Brookshire attempted to determine her name by checking with the church which had ordered the chicken.

Based on our review of this record, we conclude that the evidence was sufficient to establish that a genuine issue of material fact exists as to whether Brookshire created the condition that caused Slack to fall.

## CONCLUSION

At Brookshire's costs, the judgment denying the motion for summary judgment is affirmed. The writ is recalled as improvidently granted and denied.

17

**AFFIRMED; WRIT RECALLED AS IMPROVIDENTLY GRANTED AND DENIED.**